### FEDERAL DEPOSIT INSURANCE CORPORATION,
Plaintiff–Appellee,

v.

### BANK ONE, WAUKESHA,
Defendant–Appellant.

No. 88–2511.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1989.

Decided Aug. 1, 1989.

Rehearing and Rehearing En Banc Denied Sept. 21, 1989.

John A. Busch, Kevin P. Reak, Michael, Best & Friedrich, Milwaukee, Wis., for defendant-appellant.

William J. French, Thomas Streifender, Gibbs, Roper, Loots & Williams, Milwaukee, Wis., for plaintiff-appellee.

Before EASTERBROOK, RIPPLE, and MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

Robert Nanz carried on an elaborate check kite. The First National Bank of Waukesha was one of its victims, as well as the recipient of some of the proceeds of Nanz's fraud. (The First National Bank of Waukesha has been absorbed into Bank

One, Waukesha; we call it "the Bank" for brevity.) Nanz funnelled money from the American City Bank & Trust Co. of Milwaukee (ACB) to his account at the Bank. ACB failed, and the Federal Deposit Insurance Corporation, as ACB's receiver, sold to itself in its corporate capacity some of ACB's assets, including the right to pursue the Bank as the recipient of the proceeds. After some pretrial maneuvering, including a decision by this court refusing to direct the district judge to hold a jury trial, *First National Bank of Waukesha v. Warren*, 796 F.2d 999 (7th Cir.1986), the case went to judgment—before a jury, the district judge having changed his mind after reading our opinion. The jury brought back a verdict of $2.174 million (including prejudgment interest) in the FDIC's favor.

Nanz was a prominent real estate developer with close ties to the Bank. The Bank foolishly allowed Nanz to write checks against uncollected funds; it even certified Nanz's checks despite the absence of good funds. During 1973 Nanz Realty had gross receipts of $7.4 million but deposited some $70 million into its account at the Bank, a sure sign of monkey business. Check kiting landed him in jail and his banks in red ink. *United States v. Nanz*, 471 F.Supp. 968 (E.D.Wis.1979). The jury was entitled to find that in late 1973 the kite had approached its inevitable collapse. To postpone the evil day, Nanz had two friends—one of them Scott K. Lowry, a prominent figure in Waukesha and the Chairman of the Board of the Bank—borrow $250,000 apiece from ACB, which furnished funds on the strength of Lowry's financial statements, which were as bogus as Nanz's checks. The proceeds ended up in Nanz's account at the Bank, enabling it to pay some outstanding instruments, including one for $428,000 that it had certified. When in June 1974 the kite finally collapsed, ACB was out the $500,000 (plus interest), as the borrowers never repaid.

FDIC's theory is that the Bank was unjustly enriched as of January 1974 by $500,000. The Bank replies that it could not have been unjustly enriched because in a check kite the money flows out faster than it comes in. Although the $500,000 enabled it to cover the $428,000 check and other instruments, Nanz just wrote more paper, and the Bank never showed a positive (collected) balance in the account or controlled how Nanz used the money. Cf. *In re Bonded Financial Services, Inc.*, 838 F.2d 890 (7th Cir.1988). When the kite came down, the Bank still was some $250,000 in the hole. The jury adopted the FDIC's position, finding in special verdicts that the loans conferred a benefit on the Bank, that retention of the benefit would be inequitable, and that the damages are $2.174 million.

Buried in the Bank's scattershot appellate brief (seven questions, with sub-parts) lies one difficult issue: whether the FDIC filed this suit on time. ACB made the loans in January 1974. The kite collapsed in June 1974. The Comptroller of the Currency closed ACB in October 1975. On August 30, 1976, the FDIC objected to the discharge of Nanz in bankruptcy, contending that Nanz and Lowry jointly had injured ACB by procuring the loans, and in December 1976 the FDIC similarly objected to the discharge of Herbert Cleveland, the other borrower—so by 1976 the FDIC was on the scent. Because the FDIC did not file this suit until February 1980, the Bank says it is too late under 28 U.S.C. § 2415(b), which gives the United States only three years to begin litigation "founded upon a tort". This litigation is "founded", the Bank believes, on the fraud Nanz, Lowry, and Cleveland committed against ACB.

FDIC emphasizes in turn that the claim does not depend on *the Bank's* tort but sounds instead in "quasi-contract" or "unjust enrichment". The Bank got a benefit from the fraud of Nanz and Lowry; it would be unjust for the Bank to retain this benefit; hence there is an implied obligation to repay. If the basis of the claim is contractual, the FDIC may use 28 U.S.C. § 2415(a):

> ... [E]very action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the

complaint is filed within six years after the right of action accrues.... Unjust enrichment claims are conceived as contracts implied in law. Even if the Bank is vicariously liable for Lowry's torts, the FDIC asserts that it may waive that remedy and pursue the quasi-contract claim, with its longer statute of limitations. Because even diligent investigation would not have informed ACB about the delicts more than six years before February 1980, the FDIC concludes that its suit is timely.

■ The district judge did not choose between § 2415(a) and § 2415(b) but concluded, unbidden by either party, that the suit is timely under Wisconsin law. The Bank contends on appeal, and the FDIC agrees, that federal law applies because this suit was filed by an "agency" of the United States. The FDIC in its corporate capacity is an "agency" no matter what the status of the FDIC as receiver of a defunct bank. *FDIC v. Citizens Bank & Trust Co.*, 592 F.2d 364 (7th Cir.1979). Several cases, e.g., *FDIC v. Petersen*, 770 F.2d 141, 143 (10th Cir.1985), hold that § 2415 applies to suits by FDIC–Corporate; none holds the contrary. The district court's approach is untenable, and we must decide whether styling the claim "unjust enrichment" extends the period of limitations to six years.

We have considerable sympathy with the Bank's position. "Quasi-contract" allows the victim to follow the proceeds of the fraud, collecting them from the pocket in which they land, but does not change the gravamen of the wrong—here, fraud. No tort, no unjust enrichment. Because the FDIC could not have sued Nanz or Lowry more than three years after learning of their misdeeds, and because recovering "unjust enrichment" is simply a way to recoup the loss caused by the tort, it seems strange to think that a different caption on the pleadings, a demand against a person farther removed from the wrong, means a longer period of limitations. Unjust enrichment is a remedy in search of a wrong; as a remedy its period of limitations might logically be assimilated to that for the wrong.

Statutes frequently draw the same distinction as § 2415 between tort and contract, providing a longer period for contracts. It is an historical accident that "unjust enrichment" is treated as part of contract. Long ago, when the forms of action ruled, English courts shoehorned restitution into the writ of *assumpsit*, indulging the (useful) fiction that the beneficiary had "agreed" to repay what it did not deserve to receive. English courts allowed victims to recover that which "natural justice" dictated the beneficiaries should not keep, *Moses v. Macferlan*, [1760] 97 Eng. Rep. 676 (Mansfield, L.J.), and American courts took over the concept as part of contract law, *Prosser & Keeton on Torts* § 94 (5th ed. 1984). Still, the form of action from which unjust enrichment descended has no logical relation to the period of limitations.

Legislatures rarely give reasons for longer periods of limitations in contract cases (Congress, in particular, did not when enacting § 2415), but it is not hard to see what the reasons might be. Contracts, ordinarily written, provide evidence that is apt to be more enduring than that in the run of tort cases; moreover, because most persons monitor the performance of their contracting partners, a breach will come to light quickly, and the parties can preserve evidence. Litigation six years later thus is apt to be more accurate than deferred litigation in tort cases. Legislatures also might believe that those who do not do what they voluntarily undertook should stand ready to make amends for longer periods than those who may be sued by strangers. Each of these grounds implies that unjust enrichment belongs with tort rather than with contract.

On first principles, then, the period of limitations for unjust enrichment actions should track that of the wrong. Two district judges have reached this conclusion for purposes of § 2415(b). *Blusal Meats, Inc. v. United States*, 638 F.Supp. 824 (S.D. N.Y.1986); *United States v. Vicon Construction Co.*, 575 F.Supp. 1578 (S.D.N.Y. 1983). Unfortunately, however, first principles are the only support for this conclusion. For hundreds of years, courts in

England and the United States have been doing things otherwise, and this conclusion is too well established to be overthrown. History has its claims:

> [I]f we consider the law of contract, we find it full of history. The distinctions between debt, covenant, and assumpsit are merely historical. The classification of certain obligations to pay money, imposed by law irrespective of any bargain as quasi contracts, is merely historical. The doctrine of consideration is merely historical.

Oliver Wendell Holmes, *The Path of the Law*, 10 Harv.L.Rev. 457 (1897), reprinted in *Collected Legal Papers* 192 (1920). History becomes the foundation of statutes such as § 2415(b). When Congress uses words such as "any contract express or implied in law or fact", it uses a phrase with an established (maybe even understood) meaning, and to toss it away on the ground that it is "mere" history, and at war with instrumental considerations, is to revise the statute in the bargain.

No one doubts—though many regret—that the common law allowed the victim of a tort to elect the quasi-contract claim with its longer period of limitations. Prosser & Keeton collect many cases at pp. 664–67, 672–73. See also, e.g., *Restatement of Restitution* Introductory Note to Ch. 7, at 524 (1937); George E. Palmer, I *The Law of Restitution* § 2.3(c) (1978). Voices have been raised in opposition, most prominently that of Arthur Linton Corbin, who thought the privilege to use the longer period of limitations a bit of historical fluff that could be blown away. *Waiver of Tort and Suit in Assumpsit*, 19 Yale L.J. 221, 234–38 (1910). See also, e.g., Dan B. Dobbs, *Remedies* 238–39 (1973). Corbin and others huffed and puffed, but the detritus stayed just where it was. "Although some influential writers have condemned these decisions, their views have had relatively little influence on the course of decision." Palmer at 63–64 (footnote omitted). New York, the only important jurisdiction that had followed Corbin's view, reversed course in 1953. *Dentists' Supply Co. v. Cornelius*, 281 App.Div. 306, 119 N.Y.S.2d 570, affirmed without opinion, 306 N.Y.

624, 116 N.E.2d 238 (1953). So when Congress enacted § 2415 in 1966, providing that suits "founded upon any contract express *or implied in law* or fact" could be brought within six years, such a provision had a definite meaning in common law jurisdictions. The statute was designed to put the United States as plaintiff on the same footing as private litigants, S.Rep. No. 89–1328, 89th Cong., 2d Sess. 11–12 (1966), U.S.Code Cong. & Admin.News, 1966, p. 2502, (reprinting letter from the Attorney General). See also *United States v. Central Soya, Inc.*, 697 F.2d 165 (7th Cir.1982) (discussing functions of § 2415, though not addressing this problem). Because private litigants have been able to use the period of limitations for contracts ever since "unjust enrichment" landed in the "contract" cubbyhole in the seventeenth century, our contrary assessment does not justify a different result.

■ The two courts of appeals that have examined the question before us reached the conclusion that the United States may choose the six-year period in unjust enrichment cases. See *United States v. P/B STCO 213*, 756 F.2d 364, 374–76 (5th Cir. 1985); *United States v. Neidorf*, 522 F.2d 916 (9th Cir.1975); *United States v. Limbs*, 524 F.2d 799 (9th Cir.1975); *United States v. Dae Rim Fishery Co.*, 794 F.2d 1392 (9th Cir.1986). See also *United States v. State Farm Insurance Co.*, 599 F.Supp. 441 (E.D.Mich.1984). *Blusal* and *Vicon*, the only cases going the other way under § 2415, displayed no awareness of the history of this problem—or of the appellate decisions on the subject, for that matter. The FDIC unequivocally chose quasi-contract as the basis of its claim, jettisoning any hope for punitive damages. Its choice must be respected. So although we hold that federal law supplies the period of limitations, we agree with the district court's conclusion that the suit is timely.

Many of the Bank's remaining arguments were not preserved at trial or would require us to play trier of fact. Only two call for discussion. The Bank contends that FDIC–Corporate did not lawfully ac-

quire the chose in action, and that the Bank did not receive any benefit from the loans.

When the Comptroller of the Currency closes a national bank and the FDIC steps in to protect insured deposits, they often find it helpful to infuse some insurance proceeds and sell the failed bank together with its best assets, while retaining problematic assets such as loans in arrears. "Purchase and assumption" transactions, as these arrangements are known, require the approval of a district court. 12 U.S.C. § 192. Buyers want approval promptly so that they can reopen the bank immediately. Often the first that depositors know of the failed bank's trouble is the announcement of the P & A and the erection of the new owner's sign over the door. Business proceeds outwardly as if nothing had happened, preventing runs on the bank while allowing customers to transact normal business. ACB was sold in a P & A transaction, with the necessary judicial approval; the claim against the Bank passed to FDIC–Receiver as part of the residuary of assets not sold to the acquiring bank; FDIC–Receiver sold these leftover assets to FDIC–Corporate in consideration for the infusion of capital from the insurance fund.

█ Proceedings under § 192 are ex parte, and the Bank contends that they violate Article III because their one-sided character removes them from the category "cases or controversies". *Mitchell v. Joseph,* 117 F.2d 253, 255 (7th Cir.1941), held that because orders under § 192, like search warrants, are issued ex parte, they may not be reviewed by direct appeal. The Bank contends that the characteristics making the orders unreviewable also make them unconstitutional. The conclusion hardly follows; no one doubts that federal judges may issue ex parte search warrants or orders granting immunity under 18 U.S.C. § 6003. See *Morrison v. Olson,* —— U.S. ——, 108 S.Ct. 2597, 2614 n. 20, 101 L.Ed.2d 569 (1988). Ex parte orders may be reviewed collaterally (as seizures under a warrant may be reviewed in the criminal prosecution) even though a direct appeal is impossible. Perhaps a person adversely affected or aggrieved by an order under

§ 192 may file a civil action against the FDIC. It should be plain, however, that the Bank is not such a person. Sales of assets from the closed bank could injure the investors in that bank or the acquiring bank; the former might have a derivative claim if the assets fetched too little money, the latter a fraud claim if the FDIC delivered less than promised. So far as third parties such as the Bank are concerned, however, ACB could sell its assets to whom it pleased. We therefore do not decide whether anyone may contest an order entered under § 192, and if so under what circumstances; the Bank lacks an interest in the outcome under any view of things. If § 192 requires courts to issue advisory opinions, that's no skin off the Bank's nose. One logical option would be to expunge the judicial-approval requirement from the statute, leaving transfers of assets in the hands of the FDIC and the Comptroller. Anyway, if FDIC–Corporate does not own this chose in action, then FDIC–Receiver (or ACB's creditors) does, and the Bank is no less liable.

Unjust enrichment is impossible without enrichment, and the Bank denies that it was enriched. True, it paid the certified check with the loaned funds, but Nanz kept on washing money through the account. Perhaps the Bank could have stopped payment, had the loan not been made, despite its "acceptance" of the instrument in advance by the act of certification, so long as the check had not passed to a holder in due course. See *Farmers & Merchants State Bank v. Western Bank,* 841 F.2d 1433 (9th Cir.1987). Maybe the Bank could have dishonored other checks. In the end the Bank lost $250,000, and it asks us to conclude that as a matter of law it got no benefit.

█ Whether the Bank received a benefit is a factual question, which the jury resolved adversely to it. As happens too frequently in commercial litigation, the parties spent all of their energy on the merits and devoted little more than fulmination to damages. See *FDIC v. W.R. Grace & Co.,* 877 F.2d 614, 623 (7th Cir.1989). Here the FDIC simply pointed to the $500,000 and claimed it as the benefit. The Bank point-

ed to Nanz's control of the account and protested that there could have been no benefit. Forced to choose one of these two simplistic positions, the jury was entitled to select the FDIC's. In retrospect there were other options. Because the loans kept the kite aloft, one logical measure of the Bank's gain is the difference between its loss had things been wrapped up in January 1974 and its actual loss of $250,-000 when the kite came apart in June. At oral argument we asked the parties what the record shows about the Bank's exposure had the kite come down on the date the $500,000 was deposited, and the Bank done the same kinds of things it did in June (such as not paying any item it had not irrevocably accepted). According to counsel, the record does not reveal this sum, because no one thought it important, although it does show that the negative balance when the $500,000 arrived in January was about $1.3 million. Perhaps, then, the Bank gained more than $500,000 by keeping Nanz in business; perhaps it gained less. Appellate courts do not reconstruct the case the parties should have litigated; they decide whether there was error in the case *as* litigated. The record in the case that was put before the jury supports its verdict.

AFFIRMED