# Constitutional Concerns Presented by Proposed Orderly Liquidation Authority Panel

The Orderly Liquidation Authority Panel that would be authorized by section 202 of the Committee Print of the Restoring American Financial Stability Act of 2010 would have independent jurisdiction to determine the statutory permissibility of petitions issued by the Secretary of the Treasury to appoint the Federal Deposit Insurance Corporation as receiver for certain systemically important financial companies that are in default or in danger of default. If this Panel—a bankruptcy court tribunal composed of three judges from the U.S. Bankruptcy Court for the District of Delaware who are appointed by the Chief Judge of that court—were deemed to be a part of the Executive Branch, its exercise of this jurisdiction would raise both Appointments Clause and separation of powers concerns.

If the Panel instead were deemed to be a part of the Judicial Branch, the Appointments Clause concerns would be mitigated, if not resolved, but the separation of powers concerns would be heightened.

The Panel could be located within the Judicial Branch while addressing both the Appointments Clause and separation of powers concerns if Congress were to vest jurisdiction to review receivership petitions in an Article III court, with that court authorized to refer such petitions to the Panel and to withdraw referrals under appropriate circumstances, or if the Panel were to consist of Article III judges rather than bankruptcy judges. This structure, however, would likely prevent the Panel from adjudicating petitions where the financial company consents to the appointment of the FDIC as receiver and thus does not present a justiciable case or controversy.

April 19, 2010

Letter Opinion for the Assistant Secretary
for Financial Institutions
Department of the Treasury

This letter is to convey our constitutional concerns regarding the Orderly Liquidation Authority Panel ("Panel") that would be authorized by section 202 of the Committee Print ("Print") of the Restoring American Financial Stability Act of 2010 ("Act"). *See* S. Comm. on Banking, Housing, and Urban Affairs, Restoring American Financial Stability Act of 2010, 111th Cong. § 202 (Comm. Print 2010). As a bankruptcy court tribunal with independent jurisdiction to determine the statutory permissibility of petitions issued by the Secretary of the Treasury ("Secretary") under section 202 of the Act, the Panel would constitute an unusual type of hybrid adjudicatory entity that defies ready categorization. Congress's

establishment of such an entity, however it is categorized, would be of uncertain constitutionality because it would blur the lines between adjudications conducted by judges who enjoy the Article III protections of irreducible salary and life tenure and adjudications conducted by judges who lack those protections. The level of this uncertainty would vary to some extent, however, depending on which branch of government the Panel is determined to be located in for constitutional purposes. In our view, a court might characterize the Panel as residing in either the Executive Branch or the Judicial Branch. A determination that the Panel resides in the Executive Branch would present a relatively lower risk that the Panel violates the separation of powers, but would also render the current method of appointing the Panel's judges questionable under the Appointments Clause of the Constitution, U.S. Const. art. II, § 2, cl. 2. A determination that the Panel resides in the Judicial Branch would mitigate, if not resolve, these Appointments Clause concerns, but would in turn heighten the potential threat to judicial integrity—and the separation of powers concerns—presented by the Panel's structure.

After setting forth the statutory background, we consider the Appointments Clause and separation of powers issues that the Print raises, analyzing these issues separately depending on whether the Panel is determined to be located for constitutional purposes in the Executive Branch or the Judicial Branch. We then describe how the Panel could be structured to resolve these issues while still locating it within the Judicial Branch, but note that the Panel, even as restructured, would likely lack authority to consider one class of petitions filed by the Secretary under section 202—namely, those that concern financial companies that have consented to the appointment of the Federal Deposit Insurance Corporation ("FDIC") as their receiver—because such petitions may well not give rise to a justiciable "Case[]" or "Controvers[y]" within the meaning of Article III of the Constitution, U.S. Const. art. III, § 2, cl. 1.

## I.

The Print would require the Secretary to appoint the FDIC as receiver for certain systemically important financial companies that are in default or in danger of default, and would establish a comprehensive set of procedures to govern the making of such appointments. Print §§ 202,

203. Specifically, the Print would direct the Secretary, upon receiving a written recommendation regarding a company from the FDIC and the Board of Governors of the Federal Reserve System, to determine whether the company meets the statutory requirements for FDIC receivership. *Id.* § 203(a), (b). If the Secretary determines that the company qualifies for receivership, he must petition the Panel for an order authorizing the appointment of the FDIC as receiver, and this petition must be accompanied by notice to the FDIC and the subject company. *Id.* §§ 202(b)(1)(A)(i), 203(b). The Print would establish the Panel within the U.S. Bankruptcy Court for the District of Delaware, and would direct that it be composed of three judges from that court appointed by the Chief Judge of the court. *Id.* § 202(a)(1), (2). The Panel would have "original and exclusive jurisdiction of proceedings to consider petitions by the Secretary," *id.* § 202(a)(3), and would be charged with "establish[ing] such rules and procedures as may be necessary to ensure the orderly conduct of [its] proceedings," *id.* § 202(c)(1).

Within twenty-four hours of receiving a petition, the Panel would be required to issue a "final" determination regarding whether "substantial evidence" supports the Secretary's determination that "the covered financial company is in default or in danger of default." *Id.* § 202(b)(1)(A)(iii), (B). If the Panel determines that there is substantial evidence for the Secretary's determination, it would have to "issue an order immediately authorizing the Secretary to appoint the [FDIC] as receiver of the . . . company." *Id.* § 202(b)(1)(A)(iv). If the Panel determines that there is not substantial evidence for the Secretary's determination, it would have to provide the Secretary with a written statement of the Panel's reasons for so determining and afford the Secretary an opportunity to amend and refile the petition. *Id.* Before the Panel could issue its final determination, it would have to provide the covered financial company notice and a hearing at which the company "may oppose the petition." *Id.* § 202(b)(1)(A)(iii).

After the Panel has issued its final determination, both the Secretary and the covered financial company (through its board of directors) would be authorized to appeal that determination to the U.S. Court of Appeals for the Third Circuit, although the Third Circuit would have jurisdiction over appeals by the company only if the company "did not acquiesce or consent to the appointment of a receiver by the Secretary."

*Id.* § 202(b)(2)(A)(i), (ii). Review by the court of appeals would "be limited to whether the determination of the Secretary that a covered financial company is in default or in danger of default is supported by substantial evidence." *Id.* § 202(b)(2)(A)(iv). Once the Third Circuit has ruled, the Secretary or the company (through its board of directors) would be authorized to petition the Supreme Court to review that ruling. *See id.* § 202(b)(2)(B).

## II.

The Panel appears to be a novel type of government entity. It would be located by statute within the U.S. Bankruptcy Court for the District of Delaware, Print § 202(a)(1); would be composed of bankruptcy judges appointed by the Chief Judge of that court, *id.* § 202(a)(1), (2); and would be charged with rendering final decisions regarding the Secretary's authority under the Act to appoint the FDIC as receiver of troubled financial companies, *id.* § 202(b)(1)(A)(iii), (B). We are not aware of any precedent for Congress creating an entity of precisely this type, i.e., one (a) located within a tribunal that is by statute part of the federal judiciary, *see* 28 U.S.C. § 151 (2006) (describing bankruptcy courts as "unit[s] of the district court"); (b) composed of non-Article III judges appointed to the entity by an officer located by statute in the Judicial Branch, *see id.* § 152(a)(1) (describing bankruptcy judges as "judicial officers of the United States district court"); *infra* note 1; and (c) vested with independent jurisdiction to render final, binding decisions regarding an executive agency's exercise of its statutory authority. And while "constitutional principles of separated powers are not violated . . . by mere anomaly or innovation," *Mistretta v. United States*, 488 U.S. 361, 385 (1989), this unconventional structure does, in our view, raise constitutional concerns. The nature of these concerns differs somewhat, however, depending on whether the Panel is properly conceived of as residing for constitutional purposes within the Executive Branch or the Judicial Branch. Because the relevant judicial precedents do not afford definitive guidance with respect to locating the Panel in either branch, we consider separately the distinct constitutional concerns raised by each possibility.

## A.

There is an argument that the Print establishes the Panel within the Executive Branch for constitutional purposes, on the theory that the Executive Branch is the most plausible location for a non-Article III tribunal charged with adjudicating the permissibility of Executive Branch action affecting private rights. *Cf. Freytag v. Comm'r*, 501 U.S. 868, 909 (1991) (Scalia, J., concurring in part and concurring in the judgment, joined by O'Connor, Kennedy, and Souter, JJ.) (arguing that "[legislative] tribunals, like any other administrative board, exercise the executive power, not the judicial power of the United States").[1] Further supporting this conclusion is the fact that the creation of such an Executive Branch tribunal would not be clearly inconsistent with constitutional limitations on the legislative assignment of adjudicative functions to non-Article III courts, although there are aspects of the Panel's structure that give us some pause in this regard.

The Supreme Court has explained that Congress has "wide discretion to assign the task of adjudication in cases arising under federal law to [non-Article III] legislative tribunals," *Freytag*, 501 U.S. at 889, and that "the constitutionality of a given congressional delegation of adjudicative functions to [such a tribunal] must be assessed by reference to the purposes underlying the requirements of Article III," *CFTC v. Schor*, 478 U.S. 833, 847 (1986). "[I]n reviewing Article III challenges" to the establishment of non-Article III courts, the Supreme Court weighs "a number of factors, none of which [it] has . . . deemed determinative, with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary." *Id.* at 851. Among the factors the Court has focused on "are the extent to which the 'essential attributes of judicial power' are reserved to Article III courts, and, conversely, the extent to which the non-Article III forum exercises the range

---

[1] The Panel—like the bankruptcy courts—would not constitute an Article III court, because the bankruptcy judges who would serve on the Panel do not enjoy the constitutional protections—life tenure and an irreducible compensation—that Article III judges must possess. *See* U.S. Const. art. III, § 1; 28 U.S.C. § 152(a)(1) (bankruptcy judges appointed to fourteen-year terms); *id.* § 152(e) (authorizing removal of bankruptcy judges); *see generally N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 60–61 (1982) (plurality op.).

of jurisdiction and powers normally vested only in Article III courts, the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III." *Id.*

Here, the Panel would have the narrow function of adjudicating the statutory permissibility of a single type of action undertaken by the Secretary—albeit one with potentially significant consequences for the subject financial company—and the government would be a party to the proceedings. In addition, the Panel's decisions would be subject to review by Article III courts, even though that review would not be de novo. Given these circumstances, Article III would not appear to categorically bar the vesting of such a relatively limited adjudicatory function in a tribunal such as the Panel whose members do not enjoy the constitutional protections afforded Article III judges. *See id.* at 853–54 ("'[W]hen Congress selects a quasi-judicial method of resolving matters that could be conclusively determined by the Executive and Legislative Branches, the danger of encroaching on the judicial powers is less than when private rights, which are normally within the purview of the judiciary, are relegated as an initial matter to administrative adjudication." (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 589 (1985) (internal quotation marks omitted))); *cf. N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 67–68 (1982) (plurality opinion) (describing as subject to adjudication in Article I tribunals "matters arising between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments" and "historically [subject to] determin[ation] exclusively by those departments" (internal quotation marks and citations omitted)).

We are somewhat troubled, however, by the fact that the Panel, unlike the other non-Article III tribunals of which we are aware, would be located in an Article III court's adjunct tribunal—namely, the Bankruptcy Court for the District of Delaware—and composed of non-Article III judges of that adjunct who would continue to serve in that capacity. *See* Print § 202(a)(1), (2); *In re Kilen*, 129 B.R. 538, 542 (Bankr. N.D. Ill. 1991); *supra* p. 128. Although the Supreme Court has stated that "Congress may authorize a federal judge, in an individual capacity, to perform an executive function without violating the separation of powers," it also has suggested that "the function of resolving administrative claims" cannot "be assigned to a court, or to judges acting as part of a court."

*Mistretta*, 488 U.S. at 404; *cf.* Letter for Edward P. Boland, Chairman, Permanent Select Committee on Intelligence, U.S. House of Representatives, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, at 2 n.1 (Apr. 18, 1978) ("Harmon Memo") (noting that Supreme Court has raised concerns "over the assignment of Article III judges to non-Article III tribunals" (citing *Glidden Co. v. Zdanok*, 370 U.S. 530, 540, 561 (1962), *Ex parte Bakelite Corp.*, 279 U.S. 438, 460 (1929))). Whether the service of bankruptcy judges on the Panel and the Panel's placement in a bankruptcy court would transgress this apparent limitation on congressional authority to assign administrative power to "courts" and "judges" is not entirely clear. But we believe that, were the Panel deemed to be located in the Executive Branch, those aspects of its structure would give rise to uncertainty regarding its constitutionality because they would create at least some risk of the Panel "undermin[ing] the integrity of the Judicial Branch." *Mistretta*, 488 U.S. at 404.

An even clearer source of constitutional concern, were the Panel determined to be located within the Executive Branch, would be the possibility that the Print's method of appointing judges to serve on the Panel is inconsistent with the Appointments Clause. The Appointments Clause provides that:

> [The President] . . . shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law; but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. Panel members would have been appointed as bankruptcy judges by the U.S. Court of Appeals for the Third Circuit, *see* Print § 202(a)(2); 28 U.S.C. § 152(a)(1), and would be appointed to the Panel itself by the Chief Judge of the U.S. Bankruptcy Court for the District of Delaware, *see* Print § 202(a)(1). Accordingly, if the Appointments Clause governs the means of appointing Panel members, they would have to be inferior officers in order for their appointments to be valid.

The judges serving on the Panel would issue final, binding decisions controlling the Secretary's authority to place private companies into government receivership, and would appear to satisfy all of the other relevant criteria necessary to qualify as constitutional officers within the meaning of the Appointments Clause. *See The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 148 (1996) (explaining that "[a]n appointee (1) to a position of employment (2) within the federal government (3) that carries significant authority pursuant to the laws of the United States is required to be an 'Officer of the United States,'" and must be appointed in conformity with the Appointments Clause); *see also Buckley v. Valeo*, 424 U.S. 1, 125–26 (1976) (per curiam); *cf. Freytag*, 501 U.S. at 881–82 (special trial judges charged with assisting U.S. Tax Court judges are officers of the United States). Accordingly, the critical question concerns whether the Panel members would properly be characterized as principal officers, in which case they would have to be appointed by the President with the advice and consent of the Senate, or inferior officers, in which case they could be appointed, as the Print provides, by the Chief Judge of the U.S. Bankruptcy Court for the District of Delaware, who would appear to qualify as a "Court[] of Law" within the meaning of the Appointments Clause. *Cf. Freytag*, 501 U.S. at 888–92 (Chief Judge of Tax Court is "Court[] of Law" for purposes of Appointments Clause).

The Supreme Court has "not set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes." *Edmond v. United States*, 520 U.S. 651, 661 (1997). In *Morrison v. Olson*, 487 U.S. 654 (1998), the Court considered four factors in holding that an independent counsel authorized by the Ethics in Government Act of 1978, 28 U.S.C. §§ 591–599, was an inferior officer: (a) the independent counsel was subject to removal by a higher Executive Branch official (the Attorney General), (b) she performed only limited duties, (c) her jurisdiction was narrow, and (d) her tenure was limited. *Id.* at 671–72. The Court later characterized these factors as not "definitive," holding in *Edmond* that civilians appointed by the Secretary of Transportation to serve as judges on the Coast Guard Court of Criminal Appeals ("Court of Criminal Appeals") were inferior officers. 520 U.S. at 653, 661–66.

In *Edmond*, the Court acknowledged that judges on the Court of Criminal Appeals were not limited in "tenure" or "jurisdiction" as those terms

were used in *Morrison*. *Id.* at 661. But the *Edmond* Court nonetheless deemed them inferior officers because their work was subject to supervision by the Judge Advocate General of the Coast Guard (who controlled administrative matters) and the executive-controlled Court of Appeals for the Armed Forces (which could reverse the lower tribunal's decisions and prevent any final order from being issued). *See id.* at 664–65. The Court summarized its approach when it stated that "we think it evident that 'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Id.* at 663. In the course of its analysis, the *Edmond* Court rejected the argument that the judges on the Court of Criminal Appeals were akin to judges on the Tax Court (a non-Article III court), whom the petitioners argued were principal officers under the Court's decision in *Freytag*, 501 U.S. 868. Expressly declining to confirm this reading of *Freytag*, the *Edmond* Court noted "two significant distinctions between Tax Court judges and Court of Criminal Appeals judges" that explained why the latter were "inferior" officers even if the former were not. *Edmond*, 520 U.S. at 665. First, decisions of the Tax Court are not appealable to any higher Executive Branch tribunal, but only to Article III courts; and second, "there is no officer comparable to a Judge Advocate General who supervises the work of the Tax Court, with power to determine its procedural rules, to remove any judge without cause, and to order any decision submitted for review." *Id.* at 665–66.

*Morrison* and *Edmond* indicate that if the Panel is deemed to be an Executive Branch tribunal, its members could well be principal officers for purposes of the Appointments Clause. If so, they could only be appointed by the President with the advice and consent of the Senate. Most importantly, the decisions of the Panel, unlike the decisions issued by the Court of Criminal Appeals, would not be reviewable by any superior Executive Branch tribunal or official, but rather would be appealable only to Article III courts—the Third Circuit followed by the Supreme Court. Print § 202(b)(2)(A), (B). Moreover, Panel judges would not be subject to removal from the Panel by any higher Executive Branch official—a factor that the Court deemed significant in both *Edmond* and *Morrison*. *See Edmond*, 520 U.S. at 664 ("It is conceded by the parties that the Judge Advocate General may also remove a Court of Criminal Appeals judge from his judicial assignment without cause. The power to remove officers,

we have recognized, is a powerful tool for control."); *Morrison*, 487 U.S. at 671 (observing that "appellant is subject to removal by a higher Executive Branch official").[2] Indeed, the Act makes no express provision for the removal of judges from the Panel. The authority of the Chief Judge of the U.S. Bankruptcy Court for the District of Delaware to appoint judges to the Panel does imply that the Chief Judge may also remove them, *see Keim v. United States*, 177 U.S. 290, 293 (1900) ("In the absence of specific provision to the contrary, the power of removal from office is incident to the power of appointment."), but the circumstances in which he would be able to do so are not clear.[3]

## B.

Alternatively, there is an argument for locating the Panel within the Judicial Branch for constitutional purposes. As noted, the Print would

---

[2] It could be argued that one factor identified in *Morrison*—limited jurisdiction—weighs in favor of deeming the Panel's judges inferior officers. 487 U.S. at 672. In a sense, the Panel does have a relatively narrow jurisdiction, since it is charged solely with reviewing the Secretary's petitions for the appointment of the FDIC as receiver under the Act. However, unlike the independent counsel in *Morrison*, who was responsible for handling only a single investigation, *see id.* at 672, the Panel could be responsible for reviewing numerous petitions, indicating a broader jurisdiction.

[3] Were the Panel to be located in the Executive Branch, there would be the additional constitutional question whether the separation of powers permits the appointment and removal of the members of such an Executive Branch tribunal by judicial officers. *Cf. Morrison*, 487 U.S. at 675–76 (statute providing for interbranch appointments constitutionally impermissible where it would "impair the constitutional functions assigned to one of the branches" or "if there [i]s some incongruity between the functions normally performed by the [appointing] courts and the performance of their duty to appoint" (internal quotation marks omitted)); *id.* at 682–83 (construing termination provisions of the Ethics in Government Act not to give the Special Division of the U.S. Court of Appeals for the D.C. Circuit "anything approaching the power to *remove* the counsel while an investigation or court proceeding is still underway," and noting that "this power is vested solely in the Attorney General," in concluding that "the Special Division's power to terminate does not pose a sufficient threat of judicial intrusion into matters that are more properly within the Executive's authority to require that the Act be invalidated as inconsistent with Article III"); *cf. also Freytag*, 501 U.S. at 891 (noting that Tax Court, whose judges are appointed by the President, with the advice and consent of the Senate, and who are removable by the President for inefficiency, neglect of duty, or malfeasance in office, "remains independent of the Executive and Legislative Branches," and "[i]ts decisions are not subject to review by either the Congress or the President").

structure the Panel as a tribunal composed of bankruptcy judges appointed by the Chief Judge of the U.S. Bankruptcy Court for the District of Delaware, and would locate the Panel within that court, thus perhaps suggesting an intent on the part of its drafters to place the Panel in the same branch of government as the bankruptcy courts. Bankruptcy courts may well reside in the Judicial Branch as a constitutional matter. *Cf. United States v. Rowland*, 789 F.2d 1169, 1171 (5th Cir. 1986) (characterizing bankruptcy courts as part of Judicial Branch); *In re 1900 M Rest. Assocs., Inc.*, 319 B.R. 302, 316 (Bankr. D.D.C. 2005) (same); *In re Sharon Steel Corp.*, 100 B.R. 767, 775 (Bankr. W.D. Pa. 1989) (same). The statute designating the bankruptcy courts characterizes them as "unit[s] of the district court," 28 U.S.C. § 151, and another statutory provision characterizes bankruptcy judges "as judicial officers of the United States district court," *id.* § 152(a)(1). Bankruptcy judges are also both appointed by and subject to removal by judicial officers. *Id.* § 152(a)(1), (e). And, finally, bankruptcy judges function as judicial "adjuncts" of the district courts, qualifying for this status because in resolving proceedings arising under the Bankruptcy Code, *see* title 11, U.S. Code, they act solely by referral from—and under the supervision of—the district courts, which have original jurisdiction over bankruptcy cases and proceedings, 28 U.S.C. § 1334 (2006). *See Kilen*, 129 B.R. at 542; *cf. United States v. Raddatz*, 447 U.S. 667 (1980) (approving use of magistrates as adjuncts to Article III courts).

If the Panel were determined to be located in the Judicial Branch, the Appointments Clause analysis might differ, such that the Panel members could be deemed inferior rather than principal officers. This conclusion is far from certain, however, as the Supreme Court's precedents do not clearly establish how to ascertain the status of non-Executive Branch officers under the Appointments Clause. Nevertheless, decisions addressing the status of Executive Branch officers suggest that a relevant consideration in determining the status of any officer is whether there is some level of direction and supervision by superior officers within that officer's branch. *Cf. Edmond*, 520 U.S. at 663 ("'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate"); *id.* at 662 ("Generally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below

the President."). Here, the Panel members would be "directed and supervised at some level," *id.* at 663, by superior officers within the Judicial Branch—namely, the Chief Judge of the U.S. Bankruptcy Court for the District of Delaware, who may be able to remove them from their Panel positions, *see supra* p. 135, and the Judicial Council of the Third Circuit, which could remove them from their positions as bankruptcy judges under certain circumstances, *see* 28 U.S.C. § 152(e). Moreover, the Third Circuit and the Supreme Court would be authorized to exercise appellate review over the Panel's decisions. Print § 202(b)(2)(A), (B). Thus, even though the Panel members might be deemed principal officers if located within the Executive Branch, due to the lack of higher-level Executive Branch supervision, there is an argument that they should be deemed inferior officers if located in the Judicial Branch, due to the supervision to which they would be subject by Judicial Branch officers. *Cf. Landry v. FDIC*, 204 F.3d 1125, 1143 (D.C. Cir. 2000) (noting that "it has long been settled that federal magistrates are 'inferior Officers' under Article II").[4]

But even if Appointments Clause concerns might be diminished by a determination that the Panel is located within the Judicial Branch for constitutional purposes, such a determination would heighten the separation of powers concerns presented by the Panel's hybrid structure. Although the Panel would carry out an adjudicative function—deciding whether particular petitions by the Secretary for the appointment of the FDIC as receiver satisfy the relevant statutory criteria—its status as a non-Article III court would mean that it could not exercise Article III judicial power. *See N. Pipeline Constr. Co.*, 458 U.S. at 59 ("The judicial power of the United States must be exercised by courts having the attributes prescribed in Art. III."). As a general matter, Congress may delegate to the Judicial Branch functions that do not constitute the exercise of Article III judicial power only if those additional functions "do not trench upon the prerogatives of another Branch and . . . are appropriate to the central mission of the Judiciary." *Mistretta*, 488 U.S. at 388. For example,

---

[4] This conclusion should not be taken as expressing a view on the status under the Appointments Clause of district judges, who of course enjoy life tenure, U.S. Const. art. III, § 1, and thus are not removable except by impeachment. *See Weiss v. United States*, 510 U.S. 163, 191 (1994) (Souter, J., concurring) (stating view that district court judges are principal officers).

Congress may assign authority other than Article III judicial power to adjuncts of Article III courts, as it has done with respect to magistrate judges and bankruptcy judges. *See, e.g.*, *Raddatz*, 447 U.S. 667. In addition, the Supreme Court has approved Congress's creation within the Judicial Branch of certain entities charged with exercising rulemaking and administrative functions, including the U.S. Sentencing Commission, the Judicial Councils, the Judicial Conference of the United States, the Administrative Office of the United States Courts, and the Rules Advisory Committees. *See Mistretta*, 488 U.S. at 386–89.

We are not aware of any precedent, however, for Congress's creation within the Judicial Branch of a tribunal, like the Panel, composed of non-Article III judges and possessing the independent jurisdiction—outside of the control or supervision of any Article III court—to make binding, final decisions regarding the Executive's exercise of statutory authority. Such a Panel could not be characterized as an adjunct of an Article III court in the way that bankruptcy judges and magistrate judges function as adjuncts of the district courts. The Panel instead would have "exclusive and original" jurisdiction to determine whether the Secretary's petitions satisfy the relevant statutory criteria, Print § 202(a)(3), and neither a district court nor a court of appeals could withdraw the Panel's jurisdiction. Moreover, the Third Circuit and the Supreme Court could exercise only limited appellate review of the Panel's decisions. *See id.* § 202(b)(2)(A), (B). Thus, the Panel's functions would not appear to "be limited in such a way that 'the essential attributes' of judicial power are retained in [some overseeing] Art. III court." *N. Pipeline Constr. Co.*, 458 U.S. at 81 (quoting *Crowell v. Benson*, 285 U.S. 22, 51 (1932)).

To be sure, as we have explained, although the Panel's location within an adjunct to an Article III court and its composition of non-Article III judges in active service on that adjunct raise some constitutional concerns, we do not believe that the Constitution bars Congress from statutorily vesting the underlying adjudicative function in an Executive Branch tribunal of some kind. *See supra* pp. 130–131. But for a *Judicial Branch* tribunal to be comprised as this one is would raise special constitutional concerns and, in our view, pose a serious "threat[]" to "the institutional integrity of [that branch]." *Mistretta*, 488 U.S. at 383 (internal quotation marks omitted). Specifically, although Article III's structural protections do not bar federal courts from using non-Article III judicial officers "to

*support* judicial functions, as long as a[n Article III] judicial officer retains and exercises ultimate responsibility," *United States v. Johnson*, 48 F.3d 806, 809 (4th Cir. 1995), Article III may prevent the "elevat[ion]" of non-Article III judicial officers from "adjunct [status] to the functional equivalent of an Article III judge," *Thomas v. Arn*, 474 U.S. 140, 154 (1985). This risk would be heightened by the service of bankruptcy judges on the Panel because such service would involve those non-Article III judges exercising authority both as adjuncts to an Article III court and under a source of jurisdiction independent of any Article III court. *See supra* pp. 131–132.

The purposes underlying Article III's guarantees of undiminished compensation and lifetime tenure to federal judges would afford the structural reasons for a possible separation of powers-based objection to the Panel were it located within the Judicial Branch. Those guarantees "protect the role of the independent judiciary within the constitutional scheme of tripartite government and assure impartial adjudication in federal courts." *Union Carbide*, 473 U.S. 582–83. By creating the Panel within the Judicial Branch and designating non-Article III officers who also function as judicial adjuncts to serve on it, Congress would be enabling the Panel to draw on the "reputation for impartiality and nonpartisanship" so critical to the legitimacy of Article III courts and the non-Article III officers who support them as adjuncts. *Mistretta*, 488 U.S. at 407. But the Panel members would lack the very Article III protections designed to insulate Article III judges from political pressures on their decisionmaking. And the Panel, by virtue of its independent statutory jurisdiction, would be free of the "'total control and jurisdiction'" of an Article III court that the Supreme Court has suggested is necessary to ensure that the actions of judicial adjuncts (such as magistrate judges and bankruptcy judges) are consistent with the separation of powers. *Peretz v. United States*, 501 U.S. 923, 937 (1991) (quoting *Raddatz*, 447 U.S. at 681). The resulting blurring of the lines between judicial functions and other governmental functions—i.e., between the actions of tribunals subject to Article III's protections, either directly or by virtue of adjunct status, and the actions of a tribunal such as the Panel that is not so protected—might be thought to pose a particular threat to the integrity of the Judicial Branch. *Cf. Pacemaker Diagnostic Clinic of Am., Inc. v. Instromedix, Inc.*, 725 F.2d 537, 544 (9th Cir. 1984) (en banc) (Kennedy, J.) (identifying possibility that

Congress's provision for reference of court cases to a magistrate may threaten "the integrity of the judiciary" by "invad[ing] the power of a coordinate branch or permitting an improper abdication of that branch's central authority").

On this view, the Panel would be different in kind from both judicial adjuncts and those entities exercising rulemaking and administrative powers of a non-Article III nature that the Supreme Court has to this point allowed to be placed in the Judicial Branch. Because the Panel would exercise independent adjudicative authority of a type not given to those adjuncts and other Judicial Branch entities, it would raise separation of powers concerns they do not. Indeed, in concluding that the placement of the Sentencing Commission within the Judicial Branch was consistent with the separation of powers, the *Mistretta* Court expressly noted that the Commission lacked the power to "bind or regulate the primary conduct of the public," 488 U.S. at 396—a power that the Panel would possess by virtue of its control over the Secretary's petition authority. *See* 20 Op. O.L.C. at 168 n.116 (noting that "questions would arise under current constitutional doctrine as to the legitimacy . . . of an Article III non-judicial entity 'bind[ing] or regulat[ing] the primary conduct of the pub-lic'" (quoting *Mistretta*, 488 U.S. at 396)). Thus, by creating an entity within the Judiciary that looks and functions like a court or a judicial adjunct, but that is composed of members who are not subject to either Article III's guarantees of independence or the supervision of an Article III court, the Print would appear to risk eroding the Judiciary's reputation for neutrality. Ultimately, Congress's exercise of the authority to create such tribunals could threaten the Judicial Branch with the "'emascula-ti[on]'" against which the Supreme Court has warned. *Peretz*, 501 U.S. at 937 (quoting *Schor*, 478 U.S. at 850).[5]

---

[5] The majority opinion in *Freytag*, although touching on related themes, does not es-tablish the constitutionality of placing an entity such as the Panel within the Judicial Branch. In *Freytag*, the Court held that the special trial judges who assist Tax Court judges are inferior officers and can be appointed by the Chief Judge of the Tax Court. Like the Panel, the Tax Court is a non-Article III tribunal charged by Congress with making decisions regarding "matters that involve the application of legal standards to facts and [that] affect private interests." *Union Carbide*, 473 U.S. at 583. In determining that the Tax Court is a "Court[] of Law" within the meaning of the Appointments Clause, the Court did describe the Tax Court as "exercis[ing] judicial, rather than executive,

These concerns could be addressed by making the Panel, still composed of bankruptcy judges, a true adjunct of an Article III court, with the relationship between the two tribunals structured in a manner similar to the relationship between the district courts and the bankruptcy courts under current law. This modification would require at a minimum vesting jurisdiction to review receivership petitions in an Article III court, with that court authorized to refer such petitions to the Panel and to withdraw referrals under appropriate circumstances. Such an adjunct structure would ensure that the Panel members are subject to sufficient supervision to constitute inferior officers, and thus properly appointed by a "Court[] of Law." And such a structure would also guard against the possible threat to the integrity of the Article III judiciary that would arise from vesting binding adjudicative authority in a bankruptcy court tribunal that lacks the essential attributes of an Article III court and does not function as an adjunct to such a court. The constitutional concerns we have identified could also be addressed by providing for the service on the Panel of Article III judges rather than bankruptcy judges. The Panel members would then be appointed by the President with the advice and consent of the Senate, thereby satisfying the Appointments Clause, *see Shoemaker v. United States*, 147 U.S. 282, 301 (1893) (officer can be assigned additional duties "germane" to those the officer already performs without the need for a separate appointment), and would retain the essential attributes of Article III judges, thereby resolving the separation of powers concerns identified above.[6]

---

legislative, or administrative, power" and as "independent of the Executive and Legislative Branches." *Freytag*, 501 U.S. at 890–91. The *Freytag* Court was not presented with the question of which branch the Tax Court is located in for constitutional purposes, however, and we do not read the majority opinion to resolve definitively that the Tax Court is located in the Judicial Branch—let alone that its placement in the Judicial Branch would be consistent with the separation of powers. We are particularly reluctant to read the majority opinion as resolving this question in light of the persuasive four-justice concurrence, which argued that all legislative tribunals "exercise the executive power, not the judicial power of the United States" and that only adjudicative decisionmakers who "possess life tenure and a permanent salary" may exercise the latter power. *Id.* at 909, 911 (Scalia, J., concurring, joined by O'Connor, Kennedy, and Souter, JJ.).

[6] We do not address whether the brevity of the period the Print would allow for the Panel to reach a final decision—twenty-four hours, Print § 202(b)(1)(A)(iii)—would raise any constitutional concerns under the Due Process Clause or the separation of powers.

## III.

So long as the Panel is located within the Judicial Branch, however, whether as an Article III court or as an adjunct to an Article III court, there is considerable doubt whether the Panel could adjudicate petitions filed by the Secretary concerning companies that have affirmatively consented to the appointment of the FDIC as their receiver. Such petitions likely would not give rise to a "Case[]" or "Controvers[y]" within the meaning of Article III of the Constitution, U.S. Const. art. III, § 2, cl. 1. Moreover, even in cases in which the company that is the subject of the petition does not affirmatively consent to receivership but simply acquiesces by choosing not to appear before the Panel, there is some question whether the "case or controversy" requirement would be met.

Service of Article III judges on the Panel would appear to render the Panel an "inferior Court[]" under Article III. *Id.* art. III, § 1; *see also id.* art. I, § 8, cl. 9 (authorizing Congress "[t]o constitute Tribunals inferior to the supreme Court"); Harmon Memo at 1–2 (tribunal composed of Article III judges designated by a judicial officer constitutes Article III court). Because "Article III of the Constitution limits federal-court jurisdiction to 'Cases' and 'Controversies,'" *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007), the jurisdiction of a Panel composed of Article III judges would be so limited as well. The "case or controversy" requirement also likely would apply to the Panel were it structured simply as an adjunct to an Article III court, because in that case the Act presumably would render the Panel's jurisdiction completely derivative of the jurisdiction possessed by the Article III court. *Cf. Kilen*, 129 B.R. at 543 (holding that "[i]n establishing the bankruptcy courts of the United States, Congress assigned to those courts the resolution of certain disputes that otherwise could be resolved by the Article III district court," that "[b]y definition . . . those disputes must involve cases or controversies or Congress could not have assigned them initially to the district court to resolve," and that, therefore, "by statute . . . bankruptcy courts are limited to resolving disputes involving actual cases or controversies").

---

*See Miller v. French*, 530 U.S. 327, 349–50 (2000) (reserving the question whether Congress's imposition of a very brief period for resolution of a case before an Article III court could violate due process or the separation of powers).

As the Supreme Court has explained, "[a] justiciable controversy is . . . distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. . . . The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937) (internal citations omitted). Thus, "judicial power . . . is the right to determine actual controversies arising between adverse litigants." *Muskrat v. United States*, 219 U.S. 346, 361 (1911). "It is an essential prerequisite of a case or controversy to have at least two genuinely adverse parties, for otherwise there is no need for adjudication." Harmon Memo at 5.

Many Panel proceedings would present the degree of adverseness necessary to satisfy the "case or controversy" requirement. Companies subject to a petition would be afforded notice and an opportunity to appear before the Panel. Print § 202(b)(1)(A)(i), (iii). If a company appears and challenges the petition, that would create sufficient adverseness. Even if a company chooses not to appear, the Panel proceeding might still satisfy the requisites of Article III so long as the company does not affirmatively indicate its consent to the receivership, although the question is a close and uncertain one. If a company did affirmatively accept the receivership, however, that acceptance likely would undermine the adverseness needed to make jurisdiction proper under Article III.

As this Office has previously stated, although "the usual case or controversy involves the presence of the adverse parties and an opportunity for them to present arguments to the court, . . . this is not an absolutely necessary requirement." Harmon Memo at 5. In *Pope v. United States*, 323 U.S. 1 (1944), for example, the Supreme Court held that a contractor's suit against the government seeking payment for prior work was justiciable even though Congress had by statute essentially "consented to judgment in an amount to be ascertained by reference to [certain] specified data" and the government had not contested the suit. *Id.* at 11. The Court stated that "[w]hen a plaintiff brings suit to enforce a legal obligation it is not any the less a case or controversy upon which a court possessing the federal judicial power may rightly give judgment, because the plaintiff's claim is uncontested or incontestable." *Id.* Moreover, federal courts may "participate in the issuance of search warrants and review applications for wiretaps, both of which may require a court to consider

the nature and scope of criminal investigations on the basis of evidence or affidavits submitted in an *ex parte* proceeding." *Morrison*, 487 U.S. at 681 n.20 (internal citations omitted); *see also* Harmon Memo at 3 (mechanism for review by Article III judges of *ex parte* government applications for electronic surveillance warrants satisfies "case or controversy" requirement). Federal courts also may adjudicate *ex parte* petitions for naturalization under the Immigration and Nationality Act, even though in most such cases the United States does not appear as an adverse party and, as a result, there are no conflicting positions for the court to resolve. *See Tutun v. United States*, 270 U.S. 568, 577 (1926); Harmon Memo at 6. As we have observed, all of the above proceedings satisfy the Article III requirement of adverseness because, "while they may formally take place *ex parte*, they also implicate a potentially adverse party competent to challenge the result of the proceedings either in that forum or at a later date." Memorandum for Sheryl L. Walter, Office of Legislative Affairs, from Robert Delahunty, Special Counsel, Office of Legal Counsel, *Re: Draft Bill Entitled the "Identity Theft Victim Assistance Act of 2001"* at 3 (Feb. 6, 2001). For example, as the Court noted in *Tutun* with respect to naturalization proceedings, "[t]he United States is always a possible adverse party" to a claim for citizenship. 270 U.S. at 577.

Whether a financial company subject to a petition that chooses not to appear before the Panel might be said to be "a possible adverse party" in this sense is not clear. The Print deprives the Third Circuit of jurisdiction over company appeals if the company "acquiesce[d] or consent[ed] to the appointment of a receiver by the Secretary." Print § 202(b)(2)(A)(ii). And it appears that such a company would be statutorily foreclosed from attacking a receivership order in any collateral proceeding. *See* Print § 202(a)(3) (granting Panel "original and exclusive jurisdiction of proceedings to consider petitions by the Secretary").[7] One could argue that

---

[7] In a case involving an ex parte proceeding under 12 U.S.C. § 192, which requires the Comptroller of the Currency and the FDIC to obtain judicial approval before selling the assets of a failed bank, the U.S. Court of Appeals for the Seventh Circuit indicated (but did not decide) that the possible availability of a subsequent opportunity to challenge the outcome of the proceeding could be relevant to whether that proceeding constitutes a justiciable case or controversy. *See FDIC v. Bank One, Waukesha*, 881 F.2d 390, 394 (1989). We do not discern any obvious way, however, in which the outcome of a Panel proceeding could be challenged in a later proceeding. *See* Print § 202(a)(3).

even more so than a naturalization proceeding, a Panel proceeding—on which would turn the government's assumption of control of significant amounts of private property—would present sufficient inherent adverseness between the legal interests of the government and a private party to satisfy Article III, even if the private party does not appear to protect its interests. But we are not confident that we understand sufficiently the economic circumstances that would give rise to a petition, or the manner in which the compressed time frame for Panel consideration of a petition would unfold in practice, to deem such an argument persuasive.

Whatever the answer in the case of a company that simply failed to appear before the Panel, a proceeding concerning a financial company that had affirmatively consented to its placement in FDIC receivership would seem to lack the adverseness necessary to support the jurisdiction of an Article III tribunal. Such a company would not have interests that are "present[ly] or possibl[y] adverse" to those of the government. *Muskrat*, 219 U.S. at 357. Accordingly, a Panel proceeding concerning such a consenting company likely would not present "the honest and actual antagonistic assertion of rights" necessary to "safeguard . . . the integrity of the judicial process." *United States v. Johnson*, 319 U.S. 302, 305 (1943) (internal quotation marks omitted). Indeed, Panel consideration of a petition concerning such a company would seem to raise the same sorts of concerns as an advisory opinion, requiring "legal judgment upon issues which remain unfocused because they are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument." *United States v. Fruehauf*, 365 U.S. 146, 157 (1961). Therefore, we are concerned that a Panel proceeding concerning a consenting company would not qualify as a justiciable "case or controversy." *See, e.g.*, *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 47–48 (1971) (case dismissed based on lack of case or controversy where both sides argued that an anti-busing law was constitutional, thus "confront[ing]" the Court "with the anomaly that both litigants desire precisely the same result"); *Brown v. Watkins Motor Lines, Inc.*, 596 F.2d 129 (5th Cir. 1979) (court lacked jurisdiction to reduce attorney's fee to which plaintiff's attorney and victorious plaintiff had agreed where no party was challenging the fee). And although the Court held in *Pope* that a contractor's statutorily authorized suit was justiciable even though the

government had essentially "consented to judgment," that decision is readily distinguishable. 323 U.S. at 11. Unlike the contractor's suit, "in which the existence, validity and extent of the [government's] obligation, the existence of the data, and the correctness of the computation [could] be put at issue," *id.*, a Panel proceeding involving a company that has consented to receivership would present no issues still open for dispute between the parties.[8]

DAVID J. BARRON
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[8] Citing the Supreme Court's decision in *Ullmann v. United States*, 350 U.S. 422 (1956), the Harmon Memo observed that "the Court has held the process of issuing an order conferring immunity to be a judicial function," even though "there might be no adverse interests before the court [in such a proceeding]" because "all parties involved may actually want immunity conferred." Harmon Memo at 6; *see also Morrison*, 487 U.S. at 681 n.20 (noting role of federal courts in "compelling the testimony of witnesses"). Although *Ullmann* did hold that Article III permits a court to compel a witness's testimony, the witness in the case affirmatively contested the government's application for a court order and indeed was convicted of contempt when he continued to refuse to testify after the order was issued. *See Ullmann*, 350 U.S. at 425, 434.